[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-11540
Non-Argument Calendar
_____

D.C. Docket No. 2:18-cv-01459-SGC

VINCE WILLIS,

Plaintiff-Appellant,

versus

KOCH AGRONOMIC SERVICES, LLC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 11, 2021)

Before NEWSOM, BRANCH, and ANDERSON, Circuit Judges.

PER CURIAM:

Vince Willis appeals the magistrate judge's grant of summary judgment in

favor of his former employer, Koch Agronomic Services, LLC ("Koch") on his

claim of racial discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and 42 U.S.C. § 1981.[1]  He argues that the magistrate judge erred in granting summary judgment to Koch for several reasons. First, he argues that the magistrate judge overgeneralized Koch's articulated reasons for its termination of Willis and ignored that Willis had rebutted each reason Koch proffered to the Equal Employment Opportunity Commission ("EEOC") and during the district court proceedings.  Second, he alleges that there were inconsistencies between the proffered reasons Koch raised in its response to the EEOC and in the district court proceedings from which a jury could reasonably infer pretext.  Third, he argues that the magistrate judge erred in determining that Jeff Ogle, another Koch employee, was not a proper comparator.  And finally, he asserts that a jury could reasonably infer pretext based on racial comments made by Brett Coughlin, Willis's supervisor, and Coughlin's pattern of terminating black managers.[2]  Because we conclude there was no reversible error, we affirm.

---

[1] The parties consented to the magistrate judge presiding over and entering final judgment in the case pursuant to 28 U.S.C. 636(c).

[2] Willis also contends that the magistrate judge erred by failing to address whether Willis established a *prima facie* case of discrimination, but the magistrate judge assumed that Willis could establish a *prima facie* case for purposes of its ruling.  Therefore, Willis suffered no prejudice, and we do not address this issue further.

2

## I.     Background

In September 2013, Willis, a black male, began working as a plant manager for Agrium, a fertilizer plant in Sylacauga, Alabama.  In July 2014, Koch bought the Sylacauga plant, and Willis continued in his role as plant manager.  Willis was Koch's only black plant manager.  The plant manager position was the highest-ranking position at the plant.  As the plant manager, Willis was: (1) the talent leader, responsible for coaching his team and helping the team achieve a vision; (2) an operational excellence leader, responsible for environmental health and safety practices, including transitioning those practices to Koch's "way of doing business"; and (3) a business excellence leader, responsible for establishing a five-year plan for operations, safety, sales, quality, and finances.  Willis had five employees that reported directly to him and numerous indirect reports.

Koch terminated Willis's employment in July 2017, and thereafter, Willis filed a complaint with the EEOC asserting that he was unlawfully terminated based on his race.  In response to the EEOC complaint, Koch filed a position statement explaining that its decision to fire Willis "was based entirely on his failure to fulfill his leadership responsibility in his role as Plant Manager" and that "[r]ace was not a factor in the decision."  Koch explained that, while Willis was successful initially in the plant manager position, over time his leadership declined.  Koch provided various examples of Willis's lack of leadership.  For instance, Koch alleged that

3

Willis failed to provide sufficient guidance to maintenance manager Deva Ratnabalasuriar, which Koch believed ultimately led to Ratnabalasuriar's resignation and was "a big blow to the plant leadership." Further, when given feedback by human resources on how he could improve his leadership, Willis routinely would become defensive and would not acknowledge that he could have done things differently. Additionally, Willis failed in his role of ensuring compliance, as testing conducted by the Alabama Department of Environmental Management ("ADEM") revealed multiple operations problems with equipment and control devices. As a result of ADEM's inspection, an investigation was conducted, and while many individuals contributed to the problem, the Koch investigators recommended that Willis be removed from his role as plant manager due to a lack of leadership. The EEOC found no cause.

Willis subsequently filed the underlying complaint in the district court, alleging that he was terminated because of his race, in violation of Title VII and § 1981. Willis asserted that he was told he was fired because "he complained too much and he played the victim role," but neither were the true reason for his termination and that he was in fact terminated because of his race. Willis alleged that he was replaced by Jeff Byrd, a white male. He also noted that the investigation report was far more critical of his white co-worker Jeff Ogle, who was the Senior Operations Quality Manager, but Ogle was not fired. Accordingly,

Willis asserted that he had demonstrated that Koch's articulated reasons for his termination were false and pretext for racial discrimination.

Discovery revealed that, following Koch's acquisition of the Sylacauga plant, Willis reported to Operational Leader Brett Coughlin, a white male, who was responsible for transitioning the Sylacauga plant to a Koch facility. Coughlin, in turn, reported to Koch's vice president of operations Shawn Kimberly, a white male. From July 2014 through March 2016, Coughlin worked on-site at the Sylacauga plant alongside Willis to help with the transition. In March 2016, Coughlin moved to Wichita, Kansas, where Koch was headquartered, and Willis assumed complete leadership responsibility for the Sylacauga plant.

According to Willis, from the very beginning, Coughlin was "very critical and very restrictive of [Willis's] decision rights," and did not allow Willis to do his job properly "as far as taking ownership from the inception." For instance, Willis stated that Coughlin criticized Willis's inability to remember every employee's name, and told Willis that Willis "didn't seem connected to the facility" because he did not know about an air conditioner that was being installed. Willis maintained that Coughlin was very controlling, and he scrutinized, marked up, and often returned or rejected documents that Willis drafted. Willis acknowledged that Koch employed a different business philosophy based on market-based management that was completely new to Willis at the time Koch acquired the Sylacauga plant, and,

5

as a result, Willis needed help learning the new processes and protocols. Willis disagreed with Coughlin and the Koch team in Wichita about installing a computer-based maintenance system called MAXIMO, and he acknowledged that he called the implementation of the system "a shit sandwich." Willis stated that he had heard Coughlin use that phrase, so Willis felt that he could use it too.

On one occasion, Willis and maintenance manager Ratnabalasuriar drafted a preventive and predictive maintenance plan, which Coughlin interpreted as a request to hire twelve more employees. According to Willis, hiring new employees was simply one piece of the proposal that Willis and Ratnabalasuriar understood needed to be discussed with the group. But Coughlin declined the plan; Willis and Ratnabalasuriar were not given an opportunity for discussion, and Coughlin sent another member of Koch corporate to the plant who told Willis and Ratnabalasuriar that they did not "know how to speak Koch language" and did not "know how to communicate."

In November 2016, Willis received a meets-expectations performance review based on his performance over the preceding year. The evaluation indicated that Willis met the company's standards for culture, talent, and servant leadership, and he was building a foundation for success. The evaluation also indicated that Willis's 2016 plant turnaround "was a good example of a step change toward what good looks like," but Willis indicated that Coughlin was not

6

supportive when the plan was first presented and that leading up to the turnaround, Coughlin, Kimberly, and other members of management repeatedly accused Willis and Ratnabalasuriar of a "lack of preparedness" and criticized them.

Willis stated that, sometime in 2017, he asked Coughlin for more help and resources at the plant. In response, Coughlin sent personnel from Wichita and other locations, including Buddy Lewis, Clint Buss, and Cody Sprague. Willis stated that Lewis "had a very negative perception from the site personnel" and that Willis received numerous complaints from his staff that Lewis was "overtly negative," "not . . . supportive," and "not there to help but actually bring shame upon the plant." Similarly, Willis stated that Sprague was "extremely negative and not supportive" and expressed negative comments about Willis's leadership. Clint Buss was sent to audit and help with the plant's safety processes, but Willis believed Buss was really "a spy" for Coughlin meant to report back all "the things [Willis] wasn't doing." Willis averred that Buss's weekly feedback on the plant was mostly negative. Willis explained that, on one occasion, Buss violated a cardinal safety rule, by reaching his hand into a piece of equipment that was not locked and tagged out. Willis stated that Buss admitted doing this and it should have been a terminable offense, but nothing happened to Buss because he was "a white male and one of [Coughlin's] buddies." However, Willis acknowledged that another white employee at the plant was in fact fired for a similar safety violation.

7

Willis averred that all of the individuals sent to the plant under the guise of helping harassed Willis by "being negative of [his] managerial performance," and that at least one unnamed individual told Willis he was "a victim" and "a whiner" and stated Coughlin should fire him.  On one occasion, Willis confronted Lewis about his negative attitude and feedback and Lewis "attributed a lot of it to [Coughlin]" and told Willis "that's the message that's being sent back by [Coughlin]."  As a result of these negative interactions with the additional personnel sent to the plant, Willis eventually complained to Coughlin that "[he] didn't want any more of those people coming into [his] plant anymore because they weren't coming to help."[3]

The ADEM inspection in 2017 revealed that there was a potential issue with a scrubber at the plant.[4]  According to Willis, Ogle had been at the Sylacauga plant for over 30 years, he maintained control of the scrubbers and the control system, and Willis was not given any decision rights over these systems, even though he had asked Coughlin for such rights.  Willis said Coughlin left scrubbers and control system "with [Ogle] because [Ogle] said that was his baby," and Coughlin

---

[3] Willis explained in his deposition that he believed the individuals "were sent at [Coughlin's] behest to try to get some kind of evidence or some kind of—to show how bad I was . . . to try to prove some narrative which wasn't true."

[4] A scrubber is an environmental pollution control device used to control particulate matter coming out of the smokestack.  The distributive control system ("DCS") is used to control the equipment, and it records data from the scrubbers.

8

"always sided with [Ogle]." Prior to the ADEM testing in 2017, Willis had directed the plant employees that if they had any environmental, health, or safety issues or concerns with the scrubbers or other equipment, not to hesitate to shut down the equipment immediately. The ADEM 2017 inspection revealed that the data recorded by the system regarding the scrubbers was not accurate, and Karyn Hetherington, the plant's environmental, health and safety representative, was concerned that there was "possible foul play" by Ogle. Hetherington told Willis that Ogle "was not forthcoming with information and he controls the DCS, [and] that she didn't trust [Ogle]." ADEM issued a warning letter to the plant after the 2017 inspection.

As a result of the ADEM testing results and warning letter, Koch conducted an extensive internal investigation. Willis told the investigator that Ogle was not forthcoming with data and indicated that Ogle should report to Willis instead of Coughlin because Ogle's work influenced "[Willis's] plant and its design and processes." Willis also told the investigator that he believed that Coughlin was "aligned with . . . Ogle," was not supportive of Willis, and allowed Ogle to get away with anything, even though Ogle did not possess an engineering degree like Willis. When Willis protested something Ogle said or did, he was "called . . . a victim and a whiner," and Coughlin questioned all of Willis's decisions. Willis considered Ogle to be very negative, and Willis thought that Ogle worked to undo

9

Willis's positive influence. Willis noted that the investigator had questioned his leadership because he did not have preventive maintenance teams or projects in place, and Willis rebutted that he did have those things in place until "a lot of that got wiped out due to MAXIMO." He also told the investigator that he and Ratnabalasuriar had prepared a preventive maintenance plan, but they needed more resources to implement it, and it had been declined by corporate several times.

Willis described his own influence on the plant as positive, noting that he pushed for change, his staff liked him, and he rarely received negative feedback from the staff. Willis acknowledged, however, that, on more than one occasion, Coughlin and the human resources manager told him that the plant's "negative perception" of Koch corporate was "because of [Willis]." Willis testified that he believed Coughlin treated him differently because "he had a preconceived bias" based on Willis being the only black person in a leadership position. Willis stated that some of the other staff in the plant recognized that Coughlin was harder on Willis than other people and commented on it to Willis. Then, after Willis was terminated, at least two members of his staff contacted him stating that they did not agree with his termination and thought that race could have been a factor. Additionally, when Ratnabalasuriar resigned, he told Willis that he thought the company, and Coughlin in particular, was racist. Specifically, Ratnabalasuriar said he noticed that Koch was not diverse after attending a seminar in Wichita, and

10

Ratnabalasuriar believed that he and Willis were disrespected when they proposed the preventive maintenance plan simply because they were minorities.

Approximately six months before Willis was fired, he complained to human resources about issues he had with Coughlin as they related to Ogle, and human resources called a meeting with all three of them and led a discussion about how they could better work together. Willis explained in his deposition that he never brought race up with human resources because he was "nervous about being labeled" and "didn't want it to affect [his] employment." Willis could not recall whether it was prior to or after this meeting, but at some point he told Coughlin that he was not happy, did not feel supported, did not feel that Coughlin wanted him to succeed, was not sure if he wanted to continue to be at the plant, and wanted to know if there were other options. Coughlin responded that he would look into severance options. Willis responded that he would stay if Coughlin committed to supporting him, and Coughlin indicated he would try to do better.

In July 2017, while attending a leadership conference in Wichita, Coughlin and the human resources manager called Willis into a meeting. Coughlin told Willis that things had not been going well the last few months and Koch was terminating Willis. Other than stating that things had not been going well and making an unspecified comment on Willis's "victim mentality," Coughlin did not elaborate as to why Willis was being terminated. Willis asserted that he was

11

offered a $20,000 severance package if he left that day or a $35,000 package if he agreed to stay on for an additional three months, train someone to take over his job, and to state that he chose to resign.  According to Willis, when he expressed that he was not prepared to make that decision and wanted to speak with his attorney, Coughlin said the $35,000 was off the table because Willis was being difficult, Willis was then terminated, and he was escorted from the building by security. Willis reiterated that he believed he was terminated because of his race and because Coughlin had "preconceived biases" against him.  In support of his contention, Willis noted that he never received a negative performance review, never needed performance coaching, was selected for the leadership cohort, helped reduce plant costs, and helped develop maintenance processes that the plant still used.  Willis confirmed that he never saw the investigation report that followed ADEM's inspection until Koch responded to his EEOC charge.

When asked whether there were any other ways that Willis believed Coughlin discriminated against him, Willis stated that Coughlin had made some comments that bothered him.  In particular, Coughlin made "vague racial references about Obama a lot, how Obama was racist, the most racist president ever."[5]  And, as the 2016 election approached, Coughlin also stated "I guess

---

[5] Coughlin did not recall making any such statements.

because we had to vote for a black guy, I guess we have got to vote for a woman now." Additionally, sometime in 2015 or 2016, Coughlin made some unspecified "negative remarks about Trayvon Martin."[6] And one time after a leadership class regarding preconceived beliefs, Coughlin approached Willis and made a reference to being "in a box" with Willis,[7] which Willis interpreted to mean that Coughlin had preconceived feelings towards him, but Coughlin did not explain what he meant, or what those alleged feelings or beliefs were or why he had them, and race was not mentioned.

Coughlin testified that he started working for Koch as an area leader in 2007. In that role, he terminated several employees, all of whom were white. Coughlin became an operations leader when Koch bought the Sylacauga plant, and Willis and Ogle reported directly to him. Willis was Koch's only black plant manager. Coughlin explained that he initially hired Charlie Sanders, a black male, as the environmental, health, and safety manager to support the Sylacauga plant and another plant in St. Louis, but he fired Sanders "[d]ue to some substantial leadership gaps" based on Sanders's failure to report a rape allegation in the plant. Hetherington, a white female, replaced Sanders. Bobbie Jones, a black male shift

---

[6] Willis stated he could not remember any specific details about what Coughlin said regarding Trayvon Martin, but Willis remembered Coughlin's statements upset him.

[7] Willis explained that "being in a box" was a phrase used in the seminar and it meant that "you have some preconceived notions or feelings towards someone."

13

leader at the St. Louis plant, who reported to St. Louis plant manager Kevin Lamble, was also fired for lack of leadership and not completing his job. Lamble consulted with Coughlin about the decision to terminate Jones, but Lamble was the ultimate decisionmaker as to whether to fire Jones. Coughlin terminated Steve Crader, a white plant manager at another facility, for lack of leadership. Coughlin also terminated Everett Borg, a white environmental manager, after less than one week of employment because he made racially insensitive comments.

Coughlin confirmed that he believed Willis had a "victim mentality" because he did not take ownership of things that were his responsibility if the feedback was negative. Coughlin recalled that Willis expressed frustration with Coughlin's style of leadership, and Willis wanted Ogle to report to him, but Coughlin said no. Coughlin did not elaborate as to why he declined this request. Coughlin believed Willis lacked the leadership skills and expectations that Koch requires of its employees, including using the company's market-based management philosophy. Coughlin made the decision to terminate Willis, but he discussed the decision with Kimberly and Heather Doss, the human resources leader.

Coughlin acknowledged that he gave Willis a meets-expectations performance review in 2015, noting that Willis did "a great job of connecting with people at all levels of [the] organization"; had improved safety performance and

14

culture of the facility although the "numbers [were] not the best yet"; and had transformed the facility from operators not caring about contractor work being performed in their areas to operators being "engaged in all work taking place in their areas and stopping work if there [were] any safety concerns." Willis again received a positive performance review in 2016 of meets expectations, and he was never placed on any type of performance improvement plan, though such plans were not always used. However, over time, based on Coughlin's own observations and feedback from other Koch personnel who visited the plant, Coughlin became concerned about environmental, health, and safety compliance at the plant and Willis's failure to take ownership of health and safety issues. After the scrubber incident, Coughlin started considering terminating Willis. Coughlin acknowledged that Ratnabalasuriar's resignation was referenced as an example of Willis's leadership issues in the company's response to the EEOC charge, and it was a concern for Coughlin, but Ratnabalasuriar's resignation was "not the key reason" he decided to terminate Willis.[8] To Coughlin's knowledge, Willis is the first

---

[8] Coughlin stated that he did not help draft the EEOC response, and he could not recall whether he reviewed it prior to it being sent to the EEOC. As noted previously, in response to Willis's EEOC complaint, Koch asserted that it terminated Willis for a lack of leadership, and it provided at least four specific examples of Willis's poor leadership. These examples included: (1) Koch's belief that Willis's failure to provide proper guidance to Ratnabalasuriar led to Ratnabalasuriar's resignation; (2) a shift supervisor asked Willis how to complete the Koch process for employee discipline, and Willis "just passed the question to Doss," and then Willis became defensive when Doss provided feedback to Willis on how he could have handled the situation differently; (3) the failed ADEM inspection and the subsequent investigation; and (4) Willis's continuous blaming of the corporate headquarters for all the plant's problems.

person to complain that he was treated differently by Coughlin or the company based on race.

Coughlin reviewed the internal investigative report following the scrubber incident. The findings in the report indicated that Ogle was not forthcoming during the investigation and gave inconsistent or misleading accounts, and his approach and style was not consistent with Koch's principles and was having "a detrimental effect" on the plant culture. Further, the report indicated that it appeared that Willis had some knowledge of the needed repairs prior to the agency testing and should have taken a more proactive role leading up to the scheduled testing. While Willis had "demonstrated some leadership" following the scrubber incident and the ADEM testing, the investigators concluded that he did not "possess the skill and leadership to improve multiple aspects of operation and compliance at the Sylacauga site." The investigative team recommended that Willis be removed from his current role, and that Ogle be removed from the Sylacauga plant and/or terminated from Koch altogether. Coughlin did not agree with the report's conclusions or recommendations regarding Ogle, and he witnessed Ogle improve after some coaching.

Doss, the human resources leader, stated that after conducting an exit interview with Ratnabalasuriar, she did not believe Willis provided enough guidance for Ratnabalasuriar and that Willis "should have provided more

ownership and leadership." When she tried to give feedback to Willis, he was "defensive" and not "very receptive of it." Doss shared this information with Coughlin. Prior to Willis's termination, Doss had discussions with him concerning his failure to take "ownership of things." Doss reviewed the factors Coughlin considered to terminate Willis and determined that nothing was related to discrimination.[9] Doss was present when Coughlin fired Willis, and "the reasons around [the] termination . . . was [Willis's] lack of leadership." Doss confirmed that Coughlin was the ultimate decisionmaker in Willis's termination, but other leaders were in "alignment" with the decision.

Kimberly provided similar testimony concerning Willis's lack of leadership and blaming others instead of taking responsibility for things at the plant. He confirmed that prior to terminating Willis, he and Coughlin discussed moving Willis to a maintenance role, but there was no open position. Kimberly agreed with Coughlin's decision to terminate Willis.

Buss and Lewis, who had been sent to evaluate the plant after Willis asked for help, both provided sworn declarations in which they detailed their respective observations of Willis's lack of leadership. They conveyed these concerns to Coughlin. Additionally, several other employees also provided declarations

---

[9] Doss did not detail what factors Coughlin considered.

17

indicating that they told Coughlin that they were concerned that Willis was not engaged in training or actively resisted training from Koch headquarters.

Following discovery, Koch moved for summary judgment. The magistrate judge granted the motion finding that, even assuming Willis could establish a *prima facie* case because he was replaced by a white person, he failed to show that Koch's proffered reason for terminating him based on his poor leadership was a pretext for racial discrimination. Willis contended that Koch's proffered reason was pretextual based on (1) differences in treatment between him and Ogle; (2) positive employment evaluations; (3) inconsistencies concerning the reasons for Willis's termination; and (4) Coughlin's statements regarding President Obama when coupled with his pattern of terminating black employees. The magistrate judge found that Willis's proffered reasons did not establish pretext because (1) Ogle was not a suitable comparator; (2) the positive performance evaluations predated Coughlin's termination decision; (3) there was no inconsistency between the rationale Koch articulated to the EEOC and the reasons proffered in the court proceeding; and (4) as for other black employees who were terminated, the circumstances surrounding Willis's termination and Sanders's termination were entirely different and Coughlin did not make the decision to terminate Jones. Furthermore, Coughlin's termination of white employees for lack of leadership undermined Willis's contention that Coughlin had a pattern of making racially

discriminatory termination decisions.  And finally, Coughlin's stray comments concerning President Obama were not connected to Willis's termination and insufficient to demonstrate pretext.  This appeal followed.

## II.    Standard of Review

We review the grant of summary judgment *de novo*, viewing the record and drawing all reasonable inferences in favor of the nonmoving party.  *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017).  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Once the movant submits a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial.  If the nonmoving party presents evidence that is merely colorable or not significantly probative, summary judgment is appropriate."  *Boyle*, 866 F.3d at 1288 (quotations and internal citations omitted).

## III. Discussion

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race."  42 U.S.C. § 2000e-2(a)(1).  Both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.

19

1998).  To survive summary judgment, a plaintiff asserting a claim of intentional discrimination "must present sufficient facts to permit a jury to rule in [his] favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*).  "A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof."  *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).  Where, as here, the plaintiff relies on circumstantial evidence, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by showing that he: (1) "belongs to a protected class," (2) "was subjected to an adverse employment action," (3) "was qualified to perform the job in question," and (4) was treated less favorably by his employer than other "similarly situated" employees outside the protected class.  *Lewis*, 918 F.3d at 1220–21.

If a plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  *Id.* at 1221.  A legitimate, nondiscriminatory reason may be a subjective one, so long as the employer "articulates a clear and reasonably specific factual basis upon which it based its subjective opinion."  *Chapman v. AI Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) (*en banc*).

20

If the employer meets that burden, "the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that [he] has been the victim of intentional discrimination.'" *Lewis*, 918 F.3d at 1221 (first and second alterations in original) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.

To show pretext, an employee must demonstrate "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (*en banc*) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). "[A] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quotation omitted).

Willis argues that the magistrate judge overgeneralized Koch's articulated reasons for its termination of Willis and ignored that Willis rebutted each and

21

every reason proffered by Koch to the EEOC and during the district court proceedings.  And relatedly, Willis maintains that there are inconsistencies between the proffered reasons Koch raised in its response to the EEOC and those it raised in the district court proceedings from which a jury could reasonably infer pretext.  However, the record confirms that Koch has consistently asserted both before the EEOC and in the district court proceedings that Willis was terminated due to leadership issues.  While Koch may have provided specific examples of those leadership issues in its response to the EEOC and in deposition testimony below, contrary to Willis's contention, each of those examples was not a separate stated reason for Willis's termination.[10]  Rather, all of the examples provided fell under the umbrella of leadership issues.  Indeed, such factual examples were necessary given that Willis's lack of leadership is a subjective opinion and therefore Koch had to "articulate[] a clear and reasonably specific factual basis upon which it based its subjective opinion."  *Chapman*, 229 F.3d at 1034.  Thus, the record confirms that the magistrate judge did not overgeneralize Koch's stated reason for Willis's termination when it determined that Koch terminated Willis for

---

[10] Willis argues that the magistrate judge failed to address his argument that Koch's statement that Willis had a "victim mentality" was "overly vague" and a pretext for racial discrimination.  However, Willis's alleged "victim mentality" was not the articulated reason for his termination.  Rather, it was part of a litany of supporting facts that Koch proffered in support of its articulated reason for terminating Willis—poor leadership.  Thus, because Willis's alleged victim mentality was not the articulated reason for his termination, the magistrate judge did not err in not addressing Willis's contention that his alleged "victim mentality" was an overly vague reason that could not support his termination.

poor leadership.  Furthermore, there are no inconsistencies between Koch's

proffered reasons before the EEOC and the district court proceedings from which a

jury could infer pretext.

Willis failed to introduce any evidence that Koch's proffered reason was

false and that the real reason for his termination was racial discrimination.

*Springer*, 509 F.3d at 1349.  Indeed, Willis himself acknowledged that there were

numerous issues at the plant and that he had been reprimanded for leadership

issues and accused of not being prepared in the past.  Although he quarrels with the

lack of leadership allegations noting that he had received positive performance

reviews, was liked by his staff, and was a good employee, his argument

misapprehends the focus of the inquiry.  As our precedent makes clear,

> [t]he inquiry into pretext centers on the employer's beliefs, not the
> employee's beliefs and, to be blunt about it, not on reality as it exists
> outside of the decision maker's head. . . . The question is whether
> [the] employers were dissatisfied with [the employee] for these or
> other non-discriminatory reasons, even if mistakenly or unfairly so, or
> instead merely used those [reasons] as cover for discriminating
> against [the employee]. . . .
>
> In analyzing issues like this one, "we must be careful not to allow
> Title VII plaintiffs simply to litigate whether they are, in fact, good
> employees."

*Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (internal

citations omitted) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.

2002)); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3

(11th Cir. 1999) ("An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" (emphasis omitted) (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998)); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter . . . how mistaken the firm's managers, [we] do[] not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." (quotation omitted)).

To the extent Willis argues that a jury could infer pretext based on the difference in treatment between Willis and Ogle, given the significant differences in their leadership responsibilities, any difference in their respective treatment is not probative of pretext.[11] Willis was the plant manager, had direct reports that he

---

[11] Willis's primary argument is that the magistrate judge erred in determining that the *Lewis* factors, which are used to determine whether two individuals are similarly situated in all material respects for purposes of being a valid comparator, were not met. We held in *Lewis* that the "comparator analysis must be conducted at the *prima facie* stage of the *McDonnell Douglas* framework—and not relegated to the pretext phase." 918 F.3d at 1224. In the post-*Lewis* case at hand, the magistrate judge assumed that Willis could establish a *prima facie* case which means the court assumed that he presented a valid comparator, as it is undisputed that the comparator analysis occurs at the *prima facie* stage. *See id.* Yet, as part of the pretext inquiry, the magistrate judge cited to *Lewis* and conducted a comparator analysis—the same analysis that we held should be conducted at the *prima facie* stage not the pretext stage. To the extent the magistrate judge relegated the comparator analysis in the first instance to the pretext stage, this was error. *Id.* Nevertheless, we also noted in *Lewis* that "[e]vidence necessary and proper to support a plaintiff's *prima facie* case may of course be used, later as it were, to demonstrate that the defendant's explanation for its conduct was pretextual." *Id.* at 1223 n.9. Thus, our analysis in this case presumes that Willis established a valid comparator for purposes of the *prima facie*

24

supervised, and was responsible for the entire plant.  Ogle, on the other hand, had

no direct reports, very different responsibilities, and was not the leader of the plant.

Thus, Willis and Ogle had critically different leadership responsibilities, such that

any variance in treatment between Ogle and Willis is not probative of whether

Koch's stated reason for terminating Willis due to a lack of leadership as plant

manager was pretext for racial discrimination.  *See Lewis*, 918 F.3d at 1224.

Finally, we conclude that Willis's argument that a jury could reasonably

infer pretext based on Coughlin's comments regarding President Obama and his

pattern of terminating black managers is without merit.  Coughlin's stray, isolated

remarks concerning President Obama and the 2016 election were not related to

Willis's termination and occurred well before his 2017 termination.  And there is

no demonstrated pattern of Coughlin terminating black managers.  The evidence

established that Coughlin terminated Sanders, a black manager, due to a lack of

leadership after he failed to report a rape allegation in the plant.  There was no

other evidence presented that Coughlin made a termination decision about any

other black manager.[12]  Further, the evidence also established that Coughlin also

terminated white managers for similar leadership concerns.  Thus, Willis's

---

stage and addresses the differential treatment between Ogle and Willis only in the context of whether that differential treatment could otherwise reasonably support an inference of discrimination for purposes of establishing pretext.

[12] While the evidence established that Bobbie Jones, a black shift manager, was terminated, Lamble was the decisionmaker, not Coughlin.

contention that Coughlin had a pattern of terminating black managers is not supported by the record. And without any other evidence of pretext, Coughlin's isolated comments, which Willis contends reflect a racist attitude, are insufficient to establish pretext. *See Rojas v. Florida*, 285 F.3d 1339, 1342–43 (11th Cir. 2002) (holding that a comment made by employer to another employee (not the plaintiff) that the employee did not deserve her job because she was a woman was an isolated comment, unrelated to the decision to terminate the plaintiff, and was therefore insufficient, alone, to establish pretext); *Jones*, 151 F.3d at 1322–23 & n.10 (concluding that racial statements allegedly made by employee's supervisor were insufficient circumstantial evidence of discrimination because they were not associated with events leading to the employee's discharge and were not made by the final decisionmaker).

In conclusion, Koch asserted that it terminated Willis's employment due to leadership issues and articulated specific factual instances that supported Koch's concerns. While Willis has questioned the wisdom or correctness of Koch's termination decision, he did not present sufficient evidence to raise a jury issue as to whether Koch's legitimate, nondiscriminatory reason is pretextual. *See Rioux*, 520 F.3d at 1278 ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason for [its action] was pretextual.").

Accordingly, summary judgment in favor of Koch on Willis's racial discrimination claim was appropriate, and we affirm.

**AFFIRMED.**